UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

--------------------------------------------------------------

ISAAC RUBIN

                    Plaintiff,

    -against-

JACOB RUBIN a/k/a YANKY RUBIN, SARAH
RUBIN, MOSHE RUBIN, MOSHE GOLDBERGER,
AVROHOM ANDRUSIER a/k/a ABRAHAM
ANDRUSIER; CHEVRA HATZALAH OF NEW
YORK, HATZALAH VOLUNTEER AMBULANCE
CORPS., HATZALAH OF CROWN HEIGHTS,
BORO PARK HATZOLAH a/k/a HATZALAH OF
BORO PARK, HATZOLAH OF FLATBUSH a/k/a
FLATBUSH HATZOLAH CORPS., GERSHON
GUTTMAN a/k/a GARRY GUTTMAN,
ABRAHAM ISAAC a/k/a AVRUMI ISAAC,
HATZOLAH MEMBER "JOHN" KOFF,
HATZOLAH MEMBER YAAKOV YOEL "DOE",
HATZOLAH MEMBER LEVI "DOE"
HATZOLAH MEMBER YIDDEL "DOE",
HATZOLAH MEMBERS "JOHN DOE 1-20",
NEW YORK PRESBYTERIAN HOSPITAL,
THE NEW YORK HOSPITAL, CORNEL MEDICAL
CENTER a/k/a CORNEL HOSPITAL, NEW YORK
COMMUNITY HOSPITAL, LONG ISLAND
COLLEGE HOSPITAL, ESTATE OF ALEXANDER
YOM TOV LIPA RUBIN, CONG. BETH DAVID
GERSHON AND TALMUD TORAH, INC.,
JASON HERSHBERGER, CHARLES
LUTHER, ALISON LEE, SHARON HIRD,
ANNA ROSEN, RICHARD STORCH, DANIEL
ROSEN, MAYA HOWELL, NEW YORK STATE
COMMISSIONER OF HEALTH –
DR. NIRAV R. SHAH, NEW YORK CITY POLICE
DEPARTMENT, NEW YORK CITY POLICE
OFFICER "JOE" FREIDMAN, NEW YORK STATE
DEPARTMENT OF HEALTH, J.P. MORGAN
CHASE BANK, CITIBANK,

                    Defendants,

--------------------------------------------------------------x

ORIGINAL

CV11 - 1920

Civil Action No.

**JURY TRIAL DEMANDED**


RECEIVED
APR 14 2011
PRO SE OFFICE

Plaintiff ISAAC RUBIN, appearing pro se, as and for his complaint against the Defendants, respectfully alleges as follows:

1.    The Plaintiff ISAAC RUBIN ("Plaintiff"), is above the age of eighteen years, and a citizen of the United States of America.

2.    The Plaintiff is domiciled since approximately April 2000 in the State of Florida's Miami Dade County, and where he is a registered voter, active volunteer for the Republican party of that county, and was involved in developing a national business from within that county, together with other residents thereof.

3.    For the reasons set forth further herein, Plaintiff maintains an apartment at 929 – 43rd Street in Brooklyn, New York 11219, and where he is physically residing temporarily, and which also is temporarily acting as his mailing address.

4.    Additionally, until certain of the defendants herein directly ruined Plaintiffs business, Plaintiff was self-employed as a scribe and selling religious scrolls across the country.

5.    That upon information and belief, all natural Defendants herein are above the age of 18 years, residing in the State of New York, and none are currently domiciled in the State of Florida.

6.    This action is brought in the Eastern District Court of New York. The basis of this Courts jurisdiction is the following: a) diversity of citizenship; b) the violation by defendants of 18 United States Code Section 1962; c) violations of 42

United States Code Section 1983; d) violations of 42 United States Code Section 1985; and e) supplemental jurisdiction.

7.   The Defendant JACOB RUBIN a/k/a YANKY RUBIN ("YANKY RUBIN") resides at 1545 East 28th Street, Brooklyn, New York, and is a brother of Plaintiff.

8.   The Defendant SARAH RUBIN ("SARAH") resides at 1545 East 28th Street, Brooklyn, New York, and is a sister-in-law of Plaintiff.

9.   The Defendant MOSHE RUBIN resides at 634 Montgomery Street, Brooklyn, New York, and is a brother of Plaintiff.

10. The Defendant AVROHOM ANDRUSIER a/k/a ABRAHAM ANDRUSIER ("ANDRUSIER") resides at 628 Montgomery Street, Brooklyn, New York.

11. The Defendant MOSHE GOLDBERGER ("GOLBERGER") resides at 1269 - 47th Street, Brooklyn, New York 11219.

12. The Defendant ABRAHAM ISAAC a/k/a AVRUMI ISAAC, is a member of HATZOLAH OF FLATBUSH; he resides in Brooklyn, New York, and maintains an address at 1419 Avenue J, Brooklyn, New York.

13. The Defendant CONG. BETH DAVID GERSHON AND TALMUD TORAH, INC. ("CONGREGATION") is, upon information and belief, a New York State non-for–profit Religious Corporation, and maintains an office at 450 New York Avenue, Brooklyn, New York 11225.

14. The Defendant CHEVRA HATZALAH OF NEW YORK, upon information and belief, is a New York State non-for-profit corporation that operates at times interstate, and as the central headquarters of a volunteer emergency medical service organization, with an address at 1340 East 9th street, Brooklyn, New York.

15. The Defendant HATZOLAH OF FLATBUSH a/k/a FLATBUSH HATZOLAH CORPS. ("FLATBUSH HATZOLAH"), upon information and belief, is a New York State non-for-profit corporation that operates at times interstate, and as a volunteer emergency medical service organization, primarily within the neighborhood of Flatbush, Brooklyn, and maintains an address at 1340 East 9th Street, Brooklyn, New York 11230.

16. The Defendant HATZALAH VOLUNTEER AMBULANCE CORPS., upon information and belief, is a New York State non-for-profit corporation that operates at times interstate, and as the central headquarters of a volunteer emergency medical service organization, with an address at 1340 East 9th Street, Brooklyn, New York 11230

17. The Defendant HATZALAH OF CROWN HEIGHTS, upon information and belief, is a New York State non-for-profit corporation that operates at times interstate, and as a volunteer emergency medical service organization, though primarily within the neighborhood of Crown Heights, Brooklyn, and maintains an address at 383 Kingston Avenue, Suite #99, Brooklyn, New York 11213.

18. The Defendant BORO PARK HATZOLAH a/k/a HATZALAH OF BORO PARK, upon information and belief, is a New York State non-for-profit corporation that operates at times interstate, and as a volunteer emergency medical service organization, primarily within the neighborhood of Borough Park, Brooklyn, and maintains an address at 5215 – 16th Avenue, Brooklyn, New York 11204.

19. The Defendant NEW YORK PRESBYTERIAN HOSPITAL ("PRESBYTERIAN HOSPITAL") is, upon information and belief, a New York State corporation with an address at 21 Bloomingdale Road, White Plains, New York 10605.

20. The Defendant THE NEW YORK HOSPITAL CORNEL MEDICAL CENTER a/k/a CORNEL HOSPITAL ("CORNEL HOSPITAL") is, upon information and belief, a New York State corporation with an address at 525 East 68th Street, New York, New York 10065.

21. The Defendant NEW YORK COMMUNITY HOSPITAL ("COMMUNITY HOSPITAL") is, upon information and belief, a New York State corporation with an address at 2525 Kings Highway, Brooklyn, New York 11229, and maintains a very close business relationship with Defendant Cornel Hospital, Defendant Presbyterian Hospital, Defendant Flatbush Hatzolah, and with Defendant Yanky Rubin, and where illegal favors and expensive gifts are provided to Hatzolah and to Hatzolah members in exchange for providing new patients to fill the rooms at Defendant Community Hospital and its affiliates.

22. The Defendant SHARON HIRD ("HIRD") is a doctor affiliated with Defendant PRESBYTERIAN HOSPITAL, and who maintains an address at 21 Bloomingdale Road, White Plains, New York 10605.

23. The Defendant ANNA ROSEN is a doctor affiliated with Defendant PRESBYTERIAN HOSPITAL, and who maintains an address at 21 Bloomingdale Road, White Plains, New York 10605.

24. The Defendant RICHARD STORCH ("STORCH") is a doctor affiliated with Defendant PRESBYTERIAN HOSPITAL, and who maintains an address at 21 Bloomingdale Road, White Plains, New York 10605.

25. The Defendant DANIEL ROSEN is a doctor affiliated with Defendant PRESBYTERIAN HOSPITAL, and who maintains an address at 21 Bloomingdale Road, White Plains, New York 10605.

26. The Defendant MAYA HOWELL ("HOWELL") is a social worker affiliated with Defendant PRESBYTERIAN HOSPITAL, and who maintains an address at 21 Bloomingdale Road, White Plains, New York 10605.

27. The Defendant LONG ISLAND COLLEGE HOSPITAL ("LICH") is, upon information and belief, a New York State corporation with an address at 339 Hicks Street, Brooklyn, New York 11201.

28. The Defendant JASON HERSHBERGER ("HERSHBERGER") is a doctor affiliated with Defendant LICH, and who maintains an address at 339 Hicks Street, Brooklyn, New York 11201.

29. The Defendant CHARLES LUTHER ("LUTHER") is a doctor affiliated with Defendant LICH, and who maintains an address at 339 Hicks Street, Brooklyn, New York 11201.

30. The Defendant ALISON LEE is a in-patient social worker affiliated with Defendant LICH, and who maintains an address at 339 Hicks Street, Brooklyn, New York 11201.

31. The Defendant "John" Koff ("KOFF") is a male above the age of 18 years, and is a Hatzolah member associated with the Borough Park division of Hatzolah, and is believed to reside in Brooklyn, New York, and maintain an address at c/o HATZALAH OF BORO PARK, 5215 – 16th Avenue, Brooklyn, New York 11204. The first name of Defendant KOFF is presently unknown to Plaintiff. The designated name "John" is fictitious and is used herein for Defendant KOFF only temporarily as a substitute for his actual first name.

32. The Defendant HATZOLAH MEMBER YIDDEL "DOE" is a male above the age of 18 years, and is a Hatzolah member associated with the Borough Park division of Hatzolah, and is believed to reside in Brooklyn, New York, and maintain an address at c/o HATZALAH OF BORO PARK, 5215 – 16th Avenue, Brooklyn, New York 11204. The last name of this defendant is presently unknown to Plaintiff. The designated last name "DOE" is fictitious and is used herein only temporarily as a substitute for his actual last name.

33. The Defendant GARY GUTTMAN a/k/a GERSHON GUTTMAN ("GUTTMAN") is a member of Hatzolah, is above the age of 18 years and is believed to reside in Brooklyn, New York, and maintain an address at c/o HATZALAH OF BORO PARK, 5215 – 16th Avenue, Brooklyn, New York 11204.

34. The Defendant HATZOLAH MEMBER YAAKOV YOEL "DOE", is above the age of 18 years and is believed to reside in Brooklyn, New York, and maintain an address at c/o HATZALAH OF CROWN HEIGHTS, 383 Kingston Avenue, Suite #99, Brooklyn, New York 11213.

35. The Defendant HATZOLAH MEMBER LEVI "DOE", is above the age of 18 years and is believed to reside in Brooklyn, New York, and maintain an address at c/o HATZALAH OF CROWN HEIGHTS, 383 Kingston Avenue, Suite #99, Brooklyn, New York 11213.

36. The Defendants HATZOLAH MEMBERS "JOHN DOE 1-20" are members of the HATZOLAH NETWORK whose identities are unknown to Plaintiff at the present time, are above the age of 18 years, and are believed to maintain their residence in Brooklyn, New York, and maintain an address at c/o HATZALAH OF FLATBUSH, 1340 East 9th Street, Brooklyn, New York 11230.

37. The NEW YORK STATE COMMISSIONER OF HEALTH – DR. NIRAV R. SHAH, is cited as a defendant herein as he is currently the person responsible and mandated under Section 12 of the Public Health Law to oversee patient abuse violations, and take appropriate action against incompetence, deceit, professional misconduct and dishonesty among persons licensed by the New York State Department of Health, and particularly the corruption and horrific acts described herein. His address is: New York State Department of Health, Corning Tower, Empire State Plaza, Albany, New York 12237.

38. Additionally, it is the intent of Plaintiff that the instant federal complaint, together with all the New York State Health Department violations set

forth therein, should likewise serve as a formal complaint to the Commissioner of Health for all the aforesaid purposes.

39. The Defendant NEW YORK STATE DEPARTMENT OF HEALTH is cited here as a defendant. Its address is Corning Tower, Empire State Plaza, Albany, New York 12237.

40. The Defendant NEW YORK CITY POLICE DEPARTMENT maintains an address at One Police Plaza, New York, New York.

41. The Defendant NEW YORK CITY POLICE OFFICER "JOE" FREIDMAN, whose first name is currently unknown to Plaintiff, and "Joe" being fictitious, maintains an address at One Police Plaza, New York, New York.

42. The Defendant J.P. MORGAN CHASE BANK is believed to be a New York State corporation with an address at: 1000 Nostrand Avenue, Brooklyn, New York 11225

43. The Defendant CITI BANK is believed to be a New York State corporation with an address at: 5420 – 13th Avenue, Brooklyn, New York 11219.

44. The Defendant ESTATE OF ALEXANDER YOM TOV LIPA RUBIN is believed to be an unincorporated entity representing the entire inheritance of the late ALEXANDER YOM TOV LIPA RUBIN, of which Plaintiff is an heir, and which maintains an address at 929 – 43rd Street, Brooklyn, New York.

## PROLOGUE

45. The instant case involves two subject matters, both of which induced and set in motion the illegal and horrific conduct on the part of the defendants herein.

46. Plaintiff is an heir to a significantly large estate left to him by his great uncle who passed away childless in the summer of 2002. As part of a calculated scheme to defraud Plaintiff out of his share, the Defendant Yanky Rubin, a brother to Plaintiff, together with others acting in concert and conspiracy with him, deceived Plaintiff over a period of almost four years to believe that the great uncle was alive and well.

47. Eventually, Plaintiff discovers that the great uncle passed away some years earlier; Plaintiff was made aware that his great uncle had left a Will in which Plaintiff was included as an heir to the estate; and that Defendant Yanky is trying from every angle to embezzle and enrich himself with Plaintiff's share of the estate.

48. In addition and independent of the above, Defendant Yanky had been entrusted to oversee the transfer of certain residential property that was originally the residence and synagogue of Plaintiff's paternal grandfather, from Plaintiff's elderly father to a congregation duly incorporated some few years prior as a religious corporation. Instead, during this past August 2010, the Defendant Yanky Rubin, and his wife, Defendant Sarah Rubin, took advantage of his father's failing state of mind, and without paying any fair consideration, purportedly took assignment of a deed to that property for themselves.

49.  Plaintiff, for many years prior to moving permanently to Florida, had lived in the first floor apartment of that residential property.   After moving to Florida in April 2000, Plaintiff had legal possession of the basement of that property for certain of his belongings and to use for himself when convenient if and when he would be visiting in New York.   More recently, when visiting in Brooklyn, New York, Plaintiff sometimes stayed at that residential property.

50.   Upon information and belief, Defendant Yanky is licensed with the New York State Department of Health - Bureau of Emergency Medical Services and permitted to act in the capacity of an Emergency Medical Technician and/or paramedic, and is associated and active for over twenty years with Hatzolah located in Brooklyn, New York.  Defendant Yanky has as developed a cozy relationship with certain New York Hospitals and their personnel, as well as with certain Hatzolah members from the neighborhoods of Flatbush, Borough Park, and Crown Heights.

51.  Defendant Yanky Rubin and his cohorts working in Hatzolah, have between themselves and with other hierarchy from Hatzolah, found that they can corruptly use the Hatzolah organization as a "Mafia for hire" goon squad by illegally abusing their own New York State Department of Health issued medical license and/or certifications, and by illegally misusing the Hatzolah ambulances and the legal purposes of the Hatzolah organization, to kidnap and restrain and to hospitalize any person they choose to target.

52. Most sadly, as a result of the rampant corruption among certain affiliates of the Hatzolah organization, and which includes certain members of the organizations' hierarchy, it is well known within the community that Hatzolah is

being used as a front and illegal enterprise for breaking the law and committing false abductions in return for favors and other type paybacks.

53.   Consistent with their reputation for breaking the law and racketeering activities, a certain David Cohen of 1518 East 7th Street, in the Flatbush Section of Brooklyn, who is the ill-reputed advisor for Hatzolah, was disgracefully written up in the media (Jewish Week, June 10, 2009) for having falsely stated to an audience at a synagogue in Bergenfield, New Jersey in 2007 that tax evasion and lying on tax returns is permissible under Jewish law as long as one doesn't get caught.

54.   David Cohen's close connections with disgraced State Senator Carl Kruger are publicly known information. It is further public knowledge that Cohen's synagogue in Flatbush was built in the 1970's with ill-gained money that he obtained from then fugitive Pinky Green. (Green fled the country after being indicted by then US Attorney Rudolf Giuliani on charges of tax evasion and illegal trading.

55.   Moreover, Plaintiff believes it important to expose David Cohen and his Hatzolah connection in the instant action because he is an arrogant individual that can be expected to put out a "fatwah" type decree against Plaintiff, in retaliation for filing the instant lawsuit and exposing the corruption inside Hatzolah.

56.   As just one of the many examples reflective of the long stretched pattern of corruption practiced by certain members of Hatzolah, on Labor Day, September 1, 2008 at approximately 5P.M., Hatzolah members forcefully kidnapped a healthy minded college professor living in Flatbush who had just become involved in a divorce/custody battle.  In that case, the wife's father or

father-in-law worked as a librarian at a major Jewish orthodox organization, to wit, the Agudath Israel of America, which maintains strong political ties to Hatzolah. In fear that the professor/father was at an advantage in the custody battle, and in need to make the litigation appear more balanced, Hatzolah was dispatched to pick up the professor/father by force out of his home and have him forcefully hospitalized in a mental clinic, so as to create for him a negative record. The professor/father was released the following morning at 10:30 A.M., after having to wait 17 hours for a Labor day vacationing doctor to arrive at the hospital and sign him out. In that case, as in many others, the objective was solely to create for their victim a negative record at the courthouse, and to provide advantageous leverage in the litigation for the side they support.

57. It should not be surprising that the aforesaid professor/father was forcefully abducted by Hatzolah, since the aforementioned David Cohen maintains a very close friendship with the aforesaid librarian father-in-law; Cohen was involved and advising in that case on the side of the wife, and was openly sided against the professor/father. Actually, it would be surprising if the Hatzolah abduction had not happened.

58. In another more recent example, some high school yeshiva students, minors in age, were attending a yeshiva run by a charismatic rabbi with an excellent reputation for teaching, that had left one particular Hassidic sect and joined with a different sect, one that was not deemed highly popular by certain members of the community. Motivated by envy, these certain community members wanted to see the new yeshiva close down, and sought to discourage other boys from attending his school. Hatzolah was asked to intervene to rescue the situation. A group of corrupt Hatzolah members hunted down three of the rabbi's students that were assessed to be easy prey (ie. boys from broken homes),

and forcefully taken by ambulance to be admitted in a mental hospital, based on fictitious facts, so as to falsely give the rabbi's new school a bad reputation.

59. Less than one month ago, at approximately 3:45 P.M. on March 16, 2011, approximately (10) ten Hatzolah members including, but not limited to, Defendants Yanky, Guttman, Koff, Avrumi Isaac, Yiddel "Doe", pushed themselves into the herein Plaintiff's apartment while he was there, and forcefully removed him, despite his protests, from the apartment into a waiting ambulance, and where he was forcefully strapped down to a stretcher and driven with no less than six Hatzolah members present inside that ambulance and taken to the Defendant Cornel Hospital.

60. There was no previous medical or other type of incident whatsoever that day or that week, at Plaintiffs address, to warrant the arrival of any type of emergency service. Without a question the approximate 10 persons that arrived to abduct Plaintiff that day were not dispatched through any central dispatching office to proceed on an emergency call to Plaintiff's address, but were all co-conspirators with Defendant Yanky.

61. Upon seeing Defendant Yanky and the Hatzolah members forcing themselves into his apartment, Plaintiff called 911 and reported that he was about to be kidnapped. (Plaintiff had reason to believe he was about to be abducted, for as described further herein this was not the first time Hatzolah members were employed by Defendant Yanky for committing such a crime against the Plaintiff.) The Hatzolah members hurriedly drove Plaintiff away against his will, using a Hatzolah ambulance, before the police could have a chance to arrive.

62. After seeing that the abduction of Plaintiff was working according to plan, and after further coordinating with some of his cohorts, Defendant Koff, Isaac, and Guttman included, Defendant Yanky quickly left the scene.

63. Plaintiff was involuntarily taken by the Hatzolah ambulance and by the aforesaid six members of Hatzolah directly to Defendant Cornell Hospital, where the aforesaid three cohorts acting together in concert and in conspiracy with Defendants Yanky, Sarah, Moshe and Hatzolah of Flatbush, and Hatzolah of Borough Park, falsely instigated Defendant Cornell to unlawfully admit Plaintiff to its psychiatric ward.

64. In order to more fully explain the aforesaid defendants' criminal offenses, it is necessary to provide at this point a comprehensive background of the facts leading to Plaintiff's forced abduction by the Hatzolah members acting in concert and in conspiracy with Defendants Yanky, Sarah, and Moshe Rubin.

## BACKGROUND

65. The late Alexander Yom Tov Lipa Rubin of blessed memory ("Lipa Rubin o.b.m.") was a great uncle of Plaintiff and Defendants Yanky Rubin and Moshe Rubin.

66. The late Lipa Rubin o.b.m was considered a man of great material wealth. He resided in Brooklyn, New York at 1218 – 47th Street, with his wife until his demise on June 26, 2002. He left no surviving children.

67. During the period of 1991 through 1997 Plaintiff habitually visited Lipa Rubin at his home on the Sabbath weekend, and where they ate the Sabbath meal together.

68. Lipa Rubin often noted to Plaintiff and to others that Plaintiff was particularly special because Plaintiff was named Yitzchock Issac after Lipa Rubin's late father.

69. During about September 1999, some months prior to Plaintiff relocating to Miami, Florida, Lipa Rubin advised Plaintiff that he had prepared a will and that he named him as his heir and was leaving him the majority of his estate.

70. The Defendant Estate is of great substantial value.

71. Upon information and belief, the late Lipa Rubin o.b.m left a Last Will and Testament ("WILL"), and/or a Hebrew *halachic* document known as a "*Tzavah*" which serves for all legal purposes as his Will, (and where for the purposes of this litigation both the Will and/or "*Tzavah*" are referred to herein synonymously as the "WILL") and where Plaintiff and possibly certain others unknown at this time to Plaintiff, are the heirs to the Defendant Estate of Alexander Lipa Rubin, by virtue of having been included in said Will.

72. According to the clerks of the Kings County Surrogates Court, as of March 31, 2011, no Will for the Defendant Estate is on file or has been probated as yet.

73. Upon information and belief, about the time of the demise of the late Lipa Rubin o.b.m., the said Will passed through the hands of Defendant Yanky Rubin, who then fraudulently schemed together with Sarah Rubin, Moshe Rubin and possibly others whose identities remain unknown to plaintiff at this time, to cut Plaintiff out of the Will by pillaging and embezzling the assets of the Defendant Estate so as to enrich themselves and possibly certain other defendants herein.

74. As part of a scheme to defraud Plaintiff, between June 2002 and about early September 2006, Defendants Yanky, Sarah, and Moshe Rubin never advised Plaintiff that Lipa Rubin had passed away, or that Plaintiff was an heir to the Defendant Estate.

75. In furtherance of the said scheme, the Defendants Yanky Rubin, Sarah Rubin, and Moshe Rubin made certain that Plaintiff was not to be notified or timely advised of the demise the late Lipa Rubin o.b.m. Instead, for a period of four years following the demise, Defendant Yanky Rubin deliberately misinformed Plaintiff that their great uncle was alive and doing well except that he could not hear very well; by telling Plaintiff that he had met the great uncle at a wedding and that he sends his regards; that he saw him shopping on the avenue before he left for Israel; or that the great uncle was away visiting in Arizona.

76. As part of the said scheme, Defendants Yanky Rubin fraudulently conspired with Defendants Sarah Rubin, and Moshe Rubin, to conceal from Plaintiff the Will and any and all documentation and other evidence-reflecting Plaintiff as an heir to the Defendant Estate and not to probate same.

77. Subsequently, while Plaintiff was in New York during September 2006 he became aware that his great uncle Lipa Rubin had passed away some

years earlier, that he had left a large inheritance, and that he had written a Will in which Plaintiff was included therein as an heir.   Plaintiff then realized that he had been deliberately mislead by Defendants Yanky, Sarah and Moshe Rubin and made to believe while living in Florida that his great uncle was alive over the previous four years.

78.  Plaintiff, upon visiting his elderly parents in Brooklyn, New York in September 2006 was there informed regarding the Defendant Estate. Subsequently, Plaintiff was further informed that Defendant Yanky had taken control of the assets of the Defendant Estate and had additionally opened accounts under the name of the Defendant Congregation at J. P. Morgan Chase Bank, and Citibank, and where he had secretly deposited a part of the inheritance belonging to the Defendant Estate for safe holding in the accounts under the name of the Defendant Congregation.

79.  Upon information and belief, as of five years ago, and possibly prior thereto, the wife of the late Lipa Rubin o.b.m. suffered from dementia, was residing at the home of Defendant Moshe Goldberger, and despite many inquiries on the part of Plaintiff, it still remains unknown to Plaintiff at this time if she is still alive.

80.  Upon information and belief, Defendant Goldberger and Defendants Yanky, Sarah and Moshe Rubin are acting together in concert and conspiracy to defraud Plaintiff.

81.  Thereafter, on or about September 2006, Plaintiff directly questioned Defendant Yanky Rubin at his place of business located in Brooklyn, New York on New Utrecht Avenue by 53rd Street, as to why he was not being straightforward

with him regarding his share of the Will. Defendant Yanky became lividly enraged and stated that there were no assets in the Estate and threatened Plaintiff that he will use his connections through Hatzolah to have him committed to a mental institution, after which he could be certain that his reputation and business will be thoroughly destroyed, if he ever again hears that he is discussing the subject Will.

82.    Plaintiff was adamant not to permit Defendant Yanky cheat him of his share of the Will, and began his own investigation into the matter, and sought assistance from persons that he believed may possess additional information and evidence pertaining to the Will in the hope that he could use that information and evidence to litigate against Defendants Yanky, Sarah and Moshe Rubin.

83. In furtherance of the fraud, embezzlement, and misappropriation of the proceeds of the Defendant Estate, on the part of Defendants Yanky, Sarah, Moshe Rubin, and their co conspirators, and in response to the looming threat imposed upon them by Plaintiff's continuous investigations, and from the impending federal law suit against them, of which Defendant Yanky stole from Plaintiff's apartment on or about January 26, 2011, the Defendants Yanky, Sarah and Moshe further conspired to discredit, and thoroughly destroy the reputation and business of Plaintiff, and dispose of Plaintiff by employing the services of certain corrupt individuals associated with the Hatzolah organizations' Flatbush, Borough Park, and Crown Heights chapters.

## PLAINTIFF WAS FORCEFULLY AND IMPROPERLY ABDUCTED BY HATZOLAH MEMBERS, ACTING IN CONCERT AND CONSPIRACY WITH DEFENDANTS YANKY AND SARAH, ON THREE SEPERATE OCCASSIONS

84. For the purpose of better clarification and brevity the instant complaint sets forth the following list of defendants offenses in a reverse chronological order, with the most recent occurrences in front.

### MARCH 16, 2011 - CORNELL HOSPITAL

85. As previously stated, on March 16, 2011, Plaintiff was escorted by no fewer than six Hatzolah members in the ambulance that drove him to Defendant Cornell Hospital.

86. During the trip from 43rd Street in Brooklyn to defendant Cornell Hospital on East 68th Street in Manhattan, certain Hatzolah members repeatedly warned Plaintiff that he better stop claiming that he is an heir to his great uncles Will; that if he knows what's good for him he should just forget about the inheritance.

87. Upon arriving at Defendant Cornell Hospital, Plaintiff repeatedly insisted that he was a victim of a family inheritance dispute; that his brother, Defendant Yanky was using his Hatzolah friends to improperly abduct him absent any life or health emergency whatsoever. Plaintiff furthermore insisted repeatedly that he wants to contact his own private doctor and a lawyer, and that without fully complying to his request the hospital has no right to detain him.

88. Within an hour of arriving Plaintiff was forced to a confined area within the building of Defendant Cornell Hospital and was ordered by a guard stationed there to remove his clothing. When Plaintiff refused, and repeated that he wants to call his lawyer and private doctor, and that the hospital had no right to hold him involuntarily, the said guard threatened him that in another three minutes he would forcefully rip his clothing off him. Plaintiff was given some purple pajamas to wear.

89. Soon thereafter, a woman walked in who identified herself as a doctor for Defendant Cornell Hospital. She asked Plaintiff his date of birth and if he knew what day of the month and week it was. After Plaintiff gave her both correct answers he immediately advised her that he was in a family conflict regarding an inheritance and that his brother had used his friends in Hatzolah to abduct him from an apartment to which his brother is likewise seeking to evict him. Plaintiff respectfully insisted to that doctor that he had a right to speak with his lawyer and private doctor, and that otherwise the hospital has no right to legally hold him against his will. Upon hearing Plaintiffs demand the female doctor appeared uncomfortable and quickly left, only saying she would look into it. No further words were spoken. The said doctor never returned to speak with Plaintiff. The Plaintiff is not certain at this time as to the identity of that female doctor.

90. The entire conversation with the aforesaid female doctor lasted for no longer than two minutes at the maximum.

91. Defendant Cornell Hospital improperly held Plaintiff against his will. The Defendant Cornell Hospital blatantly violated the New York State Law by holding Plaintiff against his will absent any proper written Application and documentation, and without following the basic procedural elementary

requirements set forth in New York State Law, and known by every hospital throughout the State.

92. Defendant Cornell Hospital improperly forced Plaintiff by means of physical threats to take mind drugs against his will.

## MARCH 17, 2011 - PRESBYTERIAN HOSPITAL

93. On or about March 17, 2011, Defendant Cornell Hospital, acting in concert and in conspiracy with Defendants Yanky, Sarah, Moshe Rubin and Hatzolah members Guttman, Koff, John Doe 1-20, Hatzalah of Boro Park, Hatzolah of Flatbush, and Defendant Presbyterian Hospital and Community Hospital transferred Plaintiff against his will to a mental ward facility located at Defendant Presbyterian Hospital in White Plains, New York.

94. Defendant Presbyterian Hospital improperly held Plaintiff against his Will. The Defendant Presbyterian Hospital blatantly violated the New York State Law by holding Plaintiff against his will absent a proper written Application and documentation, and without following the basic procedural elementary requirements set forth in New York State Law, and known by every hospital throughout the State.

95. The Defendants Hird and Anna Rosen, acting in concert and conspiracy with Defendants Yanky, Sarah, Moshe Rubin and Hatzolah members Guttman, Koff, John Doe 1-20, Hatzalah of Boro Park, Hatzolah of Flatbush, and Defendants Presbyterian Hospital and Community Hospital, falsely and in a manner totally unprofessional, directly instigated and were the proximate cause for

allowing the Defendant Presbyterian Hospital to improperly hold and confine Plaintiff in their mental ward facility know as North 4.

96.    On or about March 17, 2011, the Defendant Sharon Hird issued a falsified Certification regarding Plaintiff herein, of which a copy was supposed to be forwarded to the New York State Office of Mental Health, and which stated *inter alia* . . .

**. . . P [patient] is a 46 y/o [year old] [male] ♂ [with] Diagnosis of schizoaffective d/o [disorder] . . . . he is also delusional about his family; Feels his brother is after him. P [patient was found running wildly in the street. P [patient] a danger to self and unable to care for himself    s/ Sharon Hird**

97.    On or about March 17, 2011, the Defendant anna Rosen issued a falsified Certification regarding Plaintiff herein, of which a copy was supposed to be forwarded to the New York State Office of Mental Health, which stated *inter alia* . . .

**46 y/o [year old] [male] ♂ dx [diagnosed] schizoaffective d/o [disorder] BIBA after self d/c-ing [declining] his medication after having paranoia re Depakote – found yelling in street, delusional over family conflict/inheritance.  Requires hospitalization for stabilization, re-starting medication, safety for self and others.   s/A Rosen**

98. Defendants Hird and/or Anna Rosen never examined plaintiff. Defendants Hird and Anna Rosen never saw Plaintiff standing on the street, or running wildly on the street, and certainly not yelling on any street.  As already stated above, Plaintiff had arrived by Hatzolah ambulance and had been tied down to an Hatzolah stretcher against his will.

99.  It warrants to note here that the Miriam Webster Dictionary defines the term "delusional" as:  *a persistent false psychotic belief regarding the self or persons or objects outside the self that is maintained despite indisputable evidence to the contrary;* ***also :*** *the abnormal state marked by such beliefs*

100.    Moreover, the online Wikipedia encyclopedia provides the following description relating to the term "Schizoaffective disorder": ***Schizoaffective disorder*** *is a psychiatric diagnosis that describes a mental disorder characterized by recurring episodes of elevated or depressed mood, or of simultaneously elevated and depressed mood, that alternate with, or occur together with, distortions in perception.*

101.    Neither of the Defendants Hird nor Anna Rosen ever questioned Plaintiff or requested from him any proofs and evidence, documented or otherwise, pertaining to his civil claims against his Defendants Yanky et al.  The deliberately falsified information these two medical defendants presented in the aforementioned Certification was not delusional on their part, but was blatant perjury with total disregard for the harm and injury they directly caused Plaintiff.

102.    Moreover, Defendant Anna Rosen was never authorized to act as an arbitrator in Plaintiffs inheritance dispute.  Additionally, the forged statement of Defendant Anna Rosen fails to provide any source for her basis in determining and concluding that Plaintiff is not an heir to any inheritance.

103.    Putting aside for the moment the aforementioned failure to comply with New York State Law and requirements, the forged statement by Defendants Hird and Anna Rosen additionally fails to provide a reason as to why

Plaintiff is a danger to himself or to any other member of society, and why Plaintiff had to be involuntarily locked up in the mental ward of Defendant Presbyterian Hospital for eight days.

104.    Upon information and belief, the Defendants Hird and Anna Rosen produced the aforesaid forged and falsified certification while acting in concert and in conspiracy with Defendants Yanky, Sarah, Moshe Rubin and Hatzolah members Guttman, Koff, John Doe 1-20, Hatzalah of Boro Park, Hatzolah of Flatbush, and Defendant Presbyterian Hospital and Community Hospital.

105.    Defendant Presbyterian Hospital improperly forced Plaintiff by means of physical threats to take mind drugs against his will that were prescribed by Defendant Daniel Rosen, the floor doctor that put himself in charge of Plaintiff, despite his having read the bogus and unsubstantiated certifications from Defendants Hird and Anna Rosen.

106.    Defendant Daniel Rosen was advised by Plaintiff in very clear and explicit language that he was in a family conflict regarding an inheritance and that his brother had used his friends in Hatzolah, with whom he works together, to abduct him from an apartment to which his brother is likewise seeking to evict him.  Plaintiff furthermore stated that he demands that no information from the hospital regarding him be divulged to Defendant Yanky and/or to any other members of his family, and that the hospital not be in contact with any of his family members.

Defendant Daniel Rosen, in violation of Plaintiff's basic rights, failed to comply with all of the aforesaid demands made by Plaintiff.

109.     On March 18, 2011, at approximately 2:00 P.M., Defendant Daniel Rosen was advised by a third party over the phone, Plaintiff's rabbi, that Plaintiff was indeed involved in an inheritance dispute with Defendants Yanky and Sarah, and that Defendant Yanky was falsely using his connections with Hatzolah members and the Hatzolah ambulance, to falsely intimidate and take revenge on his co-litigant/brother.

110.     During the aforesaid phone conversation, Defendant Daniel Rosen was further advised that there had been a rabbinical court date on the matter of the inheritance and the Will, and that Defendant Yanky refused to appear. In support of the aforesaid, Defendant Daniel Rosen was told that Plaintiff had a copy of the rabbinical court summons among his possessions with him.

111.     During the aforesaid phone conversation, it was demanded of Defendant Daniel Rosen that he immediately free Plaintiff, in order that he may spend the Sabbath and coming Purim Festival, which commenced on Saturday evening, in Brooklyn with his friends, and not cause Plaintiff to remain stuck and confined in a mental ward for even another fifteen minutes.

112.     Subsequently at approximately 3:15 P.M. on March 18, 2011, Defendant Daniel Rosen received another phone call insisting that he permit the

Plaintiff leave the facility forthwith, at which time he became annoyed and agitated for having been called a second time. In response, Defendant Daniel Rosen was politely told to check Plaintiff's file and where he will find no valid Application, and that New York State laws and required procedures were not being followed, and that his holding the Plaintiff against his will was a violation of law.

113.    In response to the aforesaid, Defendant Rosen stated that he will have to speak to the Plaintiff's social worker, Defendant Maya Howell.

114.    Thereafter, on March 22, 2011, Plaintiff caused to be served upon Defendant Presbyterian Hospital, a Notice dated March 22, 2011, by delivering same upon Nurse Weiss, she being the main nurse and the person in charge of the floor at that time, which stated specifically the name and address of Plaintiff's rabbi and granting the hospital permission to provide only him with information from the medical records of Isaac Rubin. On that same page, and in most clearly written words, Plaintiff wrote by hand in clear print:

**"Please be advised that no information regarding ISAAC RUBIN shall be divulged to anyone else, including family members, as per HIPPA Laws."**

115.    Defendant Maya Howell was continuously uncooperative and sought to prolong Plaintiffs stay at the Defendant Presbyterian Hospital. On the morning of March 23, 2011, Defendant Maya Howell was advised by Plaintiff in very clear and explicit words, what she should have heard from Defendant Daniel Rosen five days earlier, namely, that Plaintiff was indeed involved in an inheritance dispute with Defendants Yanky and Moshe, and that Defendant Yanky was falsely using his connections with Hatzolah members and the Hatzolah ambulance, to falsely intimidate and take revenge on his co-litigant/brother.

116.    Contrary to Plaintiff's prior instructions to Defendant Daniel Rosen, Defendant Maya Howell admitted to Plaintiff that she was in full communication with Defendants Yanky and Moshe. Particularly, she called Defendants Yanky and Moshe in the afternoon of March 23, 2011 at about 3:00 P.M., and advised both of them that Plaintiff was going to be released very shortly.

117.    Defendant Maya Howell violated the HIPPA Laws by communicating confidential patient information to two of Plaintiff's adversaries. Defendant Maya Howell had no business speaking with Plaintiff's two worst adversaries. By having done so, Defendant Maya Howell placed Plaintiff in further and continuous fear and danger that he would again be abducted. Defendant Maya Howell's actions caused Plaintiff great emotional stress and discomfort from the fear that the Defendants Yanky, Moshe, Guttman, Koff, and HATZOLAH MEMBERS JOHN DOE 1-20 would be once again hunting him down.

118.    When Defendant Maya Howell advised Plaintiff how she blabber mouthed his confidential patient information to Plaintiffs adversaries, he immediately chastised her and let her know that she had violated the HIPPA Laws.

119.    Shamelessly, and reflecting the grossly deceptive conduct by the Defendants Maya Howell, Presbyterian Hospital, Daniel Rosen, and their prejudice toward Plaintiff, the Defendant Maya Howell, in her attempting to appease the Plaintiff over her having against him violated the HIPPA Laws, stated that she will agree to include in Plaintiff's medical file and discharge papers that his claims to having rights to an inheritance were indeed corroborated.

120.     In other words, if not for the Plaintiff's catching Defendant Maya Howell violating the HIPPA Laws, the hospital's finding of fact that there was indeed an existing inheritance dispute was never to be recorded on Plaintiff's medical records. As far as the hospital was concerned, the truthful, accurate, and well corroborated statements of Plaintiff were to remain suppressed, so that Plaintiff would remain recorded on file as being delusionary with distortion of perception. Anything else would reflect the gross corruption and misconduct, or incompetence at best, on the part of Defendants Presbyterian Hospital, Daniel Rosen, Anna Rosen, Hird, Cornell Hospital, Maya Howell, Richard Storch, Virginia Susman, Babatunde Asemota, and Steven Roth (the latter three defendants are discussed further below).

121.     When Defendant Maya Howell was asked to additionally include in the hospital records that Defendant Yanky is the person with whom Plaintiff is having the inheritance dispute, and that Defendant Yanky is affiliated with Hatzolah, Defendant Maya Howell quickly refused.

122.     Plaintiff was not permitted to leave the North 4 facility until the late afternoon on Wednesday, March 23, 2011.

123.     Defendant Presbyterian Hospital improperly held and confined Plaintiff against his will in violation of New York State Law from March 17, 2011 through and including March 23, 2011.

124.     On the evening of March 23, 2011, at approximately 10:00 P.M., Plaintiff entered a restaurant on 52nd Street in Borough Park, at which time he was confronted by Defendant HATZOLAH MEMBER KOFF, who threatened without cause that he will have Plaintiff arrested.

## FEBRUARY 3 2011, - CORNELL HOSPITAL

125.     On or about the morning of January 26, 2011, Defendant Yanky entered the plaintiff's apartment at which time he stole from among Plaintiff's papers a shorter draft copy of the instant Federal District Court action against him and Defendant LICH, together with certain supporting evidence. Defendant Yanky thereafter threatened Plaintiff that he should stop immediately with the crazy idea of court, because if not he promised that matters will become much worse.

126.     Thereafter on Thursday, February 3, 2011 at approximately 3:00 P.M., Defendant Yanky, together with approximately six Hatzolah Members, including Defendants Guttman, Koff, Avrumi Isaac, "John Doe 1-20", and a New York City Police officer, forcefully entered into the basement apartment where Plaintiff was staying, located at 929 –43rd Street, Brooklyn, New York, and forcefully removed Plaintiff from the said apartment to the outside alley/driveway along side the house.

127.     At the time of the aforesaid forced entry, Plaintiff was sitting and preparing another draft of the instant federal complaint. There had been no life or medical emergency, and no valid and justified reason for either the police or emergency medical technicians to appear at the said location on that day and at that time, other than the serious concerns of Defendant Yanky being sued together with his wife and some of his other cohorts in the instant law suit.

128.     The said New York police officer that confronted Plaintiff wore a nametag with the name FRIEDMAN. A second police officer was also at the scene but stayed away a far distance and appeared not to participate.

129.    Police Officer Freidman directed Plaintiff to enter into the waiting Hatzolah ambulance.

130.    Plaintiff questioned Police Officer Friedman if he had a warrant for his detention, to which he answered "No".

131.    Plaintiff then stated to the police office "in that case you have no authority to force me to go anywhere."

132.    In response Police Officer Freidman sprayed Plaintiff with a can of mace or similar type spray, with said spray causing Plaintiff to temporarily loose his vision, choke and cough uncontrollably and experience a strong and painful burning sensation to his mouth nose and eyes for some time following.

133.    While Plaintiff was incapacitated from the aforesaid mace, one of the persons present violently pushed Plaintiffs head against the parked car in the alleyway, and then pushed him onto a prepared stretcher.  Plaintiff's hands were cruelly tied down while still gagging from the mace and while in excruciating pain from the strike against Plaintiffs head.

134.    The aforesaid Hatzolah members, acting in concert and in conspiracy with Defendants Yanky, Sarah, Moshe Rubin and Hatzalah of Boro Park, Hatzolah of Flatbush, and Hatzalah of Crown Heights, and Defendants Cornell Hospital, Presbyterian Hospital and Community Hospital, immediately thereafter transported Plaintiff to Defendant Cornell Hospital.

135.    Upon his arrival, Defendant Cornell Hospital held and confined Plaintiff against his will.

136.    Defendant Cornell Hospital refused to permit Plaintiff to use the phones to call his lawyer and private doctor.

137.    Defendant Cornell Hospital violated Plaintiffs his basic civil rights.

138.    Defendant Cornell Hospital failed to follow proper legal procedures and held and confined Plaintiff improperly.

139.    Defendant Cornell Hospital committed the aforesaid violations against Plaintiff while acting in concert and in conspiracy with Defendants Yanky, Sarah, Moshe Rubin and Hatzalah of Boro Park, Hatzolah of Flatbush, and Hatzalah of Crown Heights, and Defendants Presbyterian Hospital and Community Hospital.

140.    Plaintiff was instructed by the guard to remove his clothing and put on some jumpsuit looking pajamas.  When Plaintiff refused the said guard threatened that he would remove his clothing by force if he did not quickly comply.

141.    Plaintiff was made to feel by the personnel working at Defendant Cornell as though he was a prisoner of the German Gestapo.

142.    Defendant Cornell Hospital forced Plaintiff by means of threats to his physical safety to take mind-controlling medications against his will.

143.    Defendant Presbyterian Hospital forced Plaintiff to take mind-controlling medications even before he had been "examined" by any doctor.

## FEBRUARY 4, 2011 - PRESBYTERIAN HOSPITAL

144.    At approximately some time after midnight on Friday, February 4, 2011, Plaintiff was forcefully transported to Defendant Presbyterian Hospital.

145.    Plaintiff arrived at Defendant Presbyterian Hospital on Friday February 4, 2011, where he was involuntarily held and confined against his will.

146.    Upon information and belief, Defendant Presbyterian Hospital forcefully held and confined Plaintiff while acting in concert and in conspiracy with Defendants Yanky, Sarah, Moshe Rubin and Hatzalah of Boro Park, Hatzolah of Flatbush, and Hatzalah of Crown Heights, and Defendants Cornell Hospital and Community Hospital.

147.    Defendant Presbyterian Hospital refused to permit Plaintiff to use the phones to call his lawyer and private doctor.

148.    Plaintiff was confined to a well-guarded mental ward on the grounds of Defendant Presbyterian Hospital, known as North 4.

149.    The Public phones at North 4 did not permit any outgoing calls, thereby preventing Plaintiff from contacting anyone on the outside and seeking legal help in order to escape the hell hole he was in.

150.    Plaintiff was not allowed possession of his cell phone and/or his phone directory.

151.    Eventually, Plaintiff secretly wrote an emergency complaint letter to the New York State Department of Health, which he then caused to have smuggled out of the North 4 facility and mailed by a sympathetic individual that he met while same was visiting a different patient. Said complaint letter stated among many other things that Plaintiff's basic right to outgoing public phone service were being denied.  Plaintiff's complaint eventually delivered some positive results on the matter.

152.    Defendant Presbyterian Hospital violated Plaintiff's basic civil rights.

153.    Defendant Presbyterian Hospital failed to follow proper legal procedures and held and confined Plaintiff improperly.

154.    Defendant Presbyterian Hospital forced Plaintiff by means of threats to his physical person to take mind-controlling medications against his will.

155.    Defendant Presbyterian Hospital forced Plaintiff to take mind-controlling medications even before he had been "examined" by any doctor.

156.    On February 8, 2011, Defendant Richard Storch, the floor doctor on North 4 that put himself in charge of Plaintiff, was advised by Plaintiff in very clear and explicit language that he was in a family conflict regarding an inheritance and that his brother had used his friends in Hatzolah, with whom he works together, to abduct him from an apartment to which his brother is likewise

seeking to evict him. Plaintiff furthermore stated that he demands that no information from the hospital regarding him be divulged to Defendant Yanky and/or to any other members of his family, and that the hospital not be in contact with any of his family members.

157.    Plaintiff respectfully insisted to Defendant Richard Storch that he had a right to speak with his lawyer and private doctor, and that otherwise the hospital has no right to legally hold him against his will.

158.    Defendant Richard Storch, acting in concert and in conspiracy with Defendants Yanky, Sarah, Moshe Rubin and Hatzalah of Boro Park, Hatzolah of Flatbush, and Hatzalah of Crown Heights, and Defendants Cornell Hospital, Presbyterian Hospital and Community Hospital, in violation of Plaintiff's basic rights, failed to comply with all of the aforesaid demands made by Plaintiff.

159.    February 8, 2011 was the very first day that Plaintiff met with Doctor Defendant Richard Storch, or for that matter any doctor at Defendant Presbyterian Hospital.

160.    On Wednesday morning, February 9, 2011 Plaintiff was served with an order to show cause, dated February 8, 2011, together with a perjured supporting Verified Petition dated February 8, 2011 from Defendant Presbyterian Hospital, seeking the right to force medication down the Plaintiff that they alleged to have been prescribed, which had not been prescribed, certainly not as of February 8, 2011.

161.    Defendant Virginia Susman, as the Associate Medical Director of Psychiatry at New York –Presbyterian Hospital, falsely signed the said Verified

Petition, dated February 8, 2011. Among the falsified information stated therein, Defendant wrote that Plaintiff has a history of violent and aggressive behavior when not on proper medication; that Plaintiff has been evaluated by [Defendant] Babatunde Asemota, M.D. and [Defendant] Steven Roth, M.D.

162.    Annexed to the said falsified Verified, and in support of same were two falsified papers signed by Defendants Babatunde Asemota and Steven Roth, respectively.

163.    The aforesaid Defendants Virginia Susman, Babatunde Asemota, Steven Roth, and Defendant Presbyterian Hospital knew that Plaintiff was not in need of any medication, and that the Verified Petition was perjured and based on bogus information.

164.    Moreover the aforesaid defendants knew that the drugs that they were seeking to force down Plaintiff were dangerous and damaging to Plaintiffs body and state of mind.

165.    The aforesaid defendants acted recklessly, unprofessional and without regard to Plaintiffs health and legal rights.

166.    Plaintiff was forced to endure a prolonged stay at Defendant Presbyterian Hospital until on or about March 9, 2011, and where he was severely damaged.

## MAY 14, 2010 – LONG ISLAND COLLEGE HOSPITAL

167.     On the afternoon of May 14, 2010, Plaintiff was in the Crown heights section of Brooklyn, New York, at 643 Montgomery Street, visiting his elderly parents, at which time he was met by Defendant Moshe Rubin, who became violent with Plaintiff, by pulling away the chair that Plaintiff was sitting on, causing Plaintiff to fall.

168.     Defendant Moshe Rubin then called by phone to Defendant Yanky and advised him that Plaintiff was in Crown Heights, and said "Let's get him".

169.     Plaintiff, seeking to avoid any confrontation, picked himself up to leave and return to Borough Park.  As he walked outside the house about four minutes later, there were a group of Crown Heights Hatzolah members, including but not limited to, Defendants Avrohom Andrusier, Hatzolah Member Yaakov Yoel "Doe", Hatzolah Member Levi "Doe".  No waiting Hatzolah ambulance was seen by Plaintiff at this juncture in time.

170.     One of the non-defendant Hatzolah members politely asked Plaintiff if he wanted to go to the hospital, to which Plaintiff declined, saying there was no reason.

171.     Plaintiff then walked approximately the length of five short blocks to 311 Kingston Avenue, and where, at approximately 2:30 P.M., he ordered a car service to take him back to Borough Park.

172.    Immediately following the aforesaid, Plaintiff was confronted by Defendants Avrohom Andrusier, Hatzolah Member Yaakov Yoel "Doe", Hatzolah Member Levi "Doe", who, acting in concert and in conspiracy with Defendants Yanky, Sarah, Moshe Rubin, Hatzalah of Boro Park, who forcefully grabbed Plaintiff and forced him into a waiting ambulance belonging to Hatzalah of Boro Park.

173.    Plaintiff overheard his abductors saying that it was previously arranged for Plaintiff to be taken to Defendant Long Island College Hospital (LICH).

174.    Plaintiff, before being tied down by his abductors, called the police from his phone and advised them that he was being abducted against his will and believed he was being taken to Defendant LICH.

175.    The aforesaid Hatzolah members forcefully transported Plaintiff to Defendant Long Island College Hospital.

176.    Police did find Plaintiff at Defendant LICH and took a written report from Plaintiff.

177.    Subsequently, Plaintiff learned through the New York City Police Department that Defendant Hatzolah of Crown Heights had determined on that day that there was no cause to take Plaintiff to the hospital, and that the ambulance that did in fact transport Plaintiff to Defendant LICH came from Defendant BORO PARK HATZOLAH.

178.      Moreover, the New York City Police Department confirmed that what Plaintiff believed all along, namely, that there was no Hatzolah call to the Hatzolah central dispatcher in Crown Heights reporting any emergency.  That the corrupt Defendant Hatzolah members, namely Defendants Avrohom Andrusier, Hatzolah Member Yaakov Yoel "Doe", Hatzolah Member Levi "Doe", and certain number of Hatzolah Members "John Doe 1-20", were acting privately, and in concert and conspiracy with Defendant Yanky et al, under the guise of Hatzolah of Crown Heights.

179.      Plaintiff however believes that Hatzolah of Crown Heights possesses much more information regarding the subject abduction, which will be reveled to the Court at trial.

180.      On May 14, 2010, due the extreme stress caused by the aforesaid defendants forced abduction, and forced restraints, plaintiff began having severe chest pains while being forcefully transported in the ambulance belonging to Hatzolah of Boro Park.

181.      Upon Plaintiff arriving at Defendant LICH, he was found to be in near cardiac arrest and stroke.  The hospital staff at the emergency administered Plaintiff nitroglycerin and moved Plaintiff to the cardiac Intensive Care Unit, for approximately the next twenty-four hours.

182.      Thereafter Plaintiff was transferred to the hospital's cardiac unit at room #548, and where a nurse was stationed in the room the entire time.

183.      At first Plaintiff believed her presence was for monitoring his heart.  However, as explained below, Plaintiff realizes after a few days, that her presence was there to prevent him from leaving the Defendant LICH.

184.      On or about early May 17, 2010, an Indian woman dressed in a green sari visited Plaintiff in the cardiac unit.  Plaintiff had never before met that Indian woman. The woman wore no identification and carried no stethoscope.  In other words, she appeared as a non-professional. Upon entering the room she asks Plaintiff his name; his date of birth and that day's date, which happened to be written in large, and updated daily, on a white board hanging on the wall in the room, assumingly for the convenience of the hospital staff that are ignorant of the proper day.

185.      Plaintiff responded with his proper name, his proper birthday and date, May 17, 2010, exactly as written on the wall, which likewise corresponded correctly to the date on his calendar watch.   To his astonishment the unidentified woman in her Mumbai accent told Plaintiff "I am sorry, but you answered me incoherently and you will need to be committed for psychiatric care."

186.      Immediately, Plaintiff requested to speak with the doctor in charge of the cardiac floor, but his requests fell on deaf ears. Plaintiff contacted the staff nurse on the cardiac floor and asked her to find out who was the clown dressed in the sari that came by, but she said she did not know.

187.      Moreover, Plaintiff had been told by the doctor on the cardiac floor that he was to be discharged on May 18, 2010.  Plaintiff contacted two friends, both of whom arrived on May 18, 2010 for the purpose of assisting Plaintiff with leaving the hospital.

188.    While said two friends and Plaintiff were talking in the room on May 18, 2010, awaiting Plaintiff to be discharged, the Defendant Jason Hershberger appeared and rudely told the two friends of Plaintiff to leave the room immediately. Plaintiff had never met Defendant Hershberger before and felt he had no right to be so rude. Plaintiff insisted that he speak to him in the presence of his friends and that they not leave the room. Defendant Hershberger insisted that they cannot be in the room when he speaks to Plaintiff, and so they left. Defendant Hershberger, while unaware that one of the two visitors remained listening at the door, he asked Plaintiff the same three questions that were asked by the aforementioned unidentified Indian woman, namely: Plaintiff's name; Plaintiff's date of birth; and that day's date. Once again, Plaintiff answered all three accurately, at which time Defendant Hershberger left the room.

189.    Approximately fifteen minutes later, following the above, Defendant Charles Luther walked into the room, and again demanded that the two visitors leave the room. Defendant Luther asked Plaintiff the same three questions asked by Defendant Hershberger and the Indian woman of the day before. Unknown to Defendant Luther, one of Plaintiffs visitors stood by the door and overheard Dr. Luther asking, and Plaintiff answering correctly.

190.    Upon information and belief, Defendants Hershberger and Luther issued falsified Certifications to Support a deceptive Application for Involuntary Admission.

191.    Upon information and belief, the Defendants Hershberger and Luther produced the aforesaid falsified certification while acting together in concert and conspiracy with Defendants Yanky, Sarah, Moshe Rubin, Avrohom

Andrusier, Hatzolah Member Yaakov Yoel "Doe", Hatzolah Member Levi "Doe", and certain number of Hatzolah Members "John Doe 1-20", acting under the guise of Hatzolah of Crown Heights, and Defendants LICH and Alison Lee.

192.    At about four or five o'clock that afternoon, a person from the staff of Defendant LICH arrived at the Plaintiff's room and advised Plaintiff that he was not being allowed to leave the Defendant LICH in accordance with a determination by Defendants Hershberger and Luther.

193.    Plaintiff was immediately thereafter transferred against his will to the psychiatric ward of Defendant LICH, and where he was forced to remain for approximately fourteen days.

194.    Plaintiff insisted immediately upon his arrival at the LICH psychiatric ward that he wanted an independent physician's evaluation and that he has the right to see a lawyer, but his demands were ignored.

195.    Plaintiff demanded from the first day of his arrival to the LICH psychiatric ward that he wants to see the medical paperwork, including the mandated Application and supporting Certifications, relating to his involuntary Admission, but his demand was totally ignored.

196.    On or about the early evening of May 18, 2010, Plaintiff was transferred from the cardiac I.C.U to a regular room, only to find that Defendant LICH had placed a 24 hour guard inside his room to make certain that Plaintiff did not leave.

197.    Plaintiff insisted that he did wished to leave, but was told by staff of Defendant LICH that he cannot leave. Plaintiff requested of the staff a copy of the Application and supporting certificates so as to know who was the person overtly behind his confinement, only to be reused.

198.    On May 18, 2010, Plaintiff demanded of the staff of Defendant LICH that he be permitted to have an independent medical opinion and to have a lawyer. Again his request was refused.

199.    Plaintiff complained to Defendant ALISON LEE, that he was being held improperly against his will; that he had a right under law to see his file and the basis on which they purport to be holding him against his will.

200.    Defendant Alison Lee stated that LICH does not always follow procedures; just forget about it; take your medication and eventually you will be permitted to go leave.

201.    The aforesaid Defendants Hershberger, Luther, and Alison Lee and Defendant LICH knew that Plaintiff was not in need of any medication, and that the Verified Petition, if they had one, was perjured and based on bogus information.

202.    Moreover the aforesaid defendants knew that the drugs that they were seeking to force down Plaintiff were dangerous and damaging to Plaintiffs body and state of mind.

203.    The aforesaid defendants acted recklessly, unprofessional and without regard to Plaintiffs health and legal rights.

204.    Plaintiff was forced to endure a prolonged stay at Defendant LICH until on or about May 31, 2011, and where he was severely damaged.

205.    Plaintiff has reasonable cause to believe that Plaintiff Yanky and his Hatzolah cohorts will attempt to abduct him again, and harm him again, in the near future absent this Court's intervention.

206.    Plaintiff was severely damaged by Defendant LICH, who acted together in concert and conspiracy with Defendants Yanky, Sarah, Moshe Rubin, Avrohom Andrusier, Hatzolah Member Yaakov Yoel "Doe", Hatzolah Member Levi "Doe", and certain number of Hatzolah Members "John Doe 1-20", acting under the guise of Hatzolah of Crown Heights, and Defendants Hershberger, Luther, and Alison Lee.


## FIRST CAUSE OF ACTION

207.    Plaintiff repeats and realleges each and every allegation as more fully set forth hereinbefore as if fully set forth hereinafter.

208.    As a result of Plaintiff's forced imprisonment and continued forced imprisonment, Plaintiff has been severely damaged by defendants acting in concert and conspiracy, in the amount of fifty million dollars.

## SECOND CAUSE OF ACTION

209.   Plaintiff repeats and reallege each and every allegation as more fully set forth hereinbefore as if fully set forth hereinafter.

210.   As a result of defendants acting in concert and conspiracy, to cause Plaintiff to be forced to take mind-controlling drugs, plaintiff has been severely damaged by defendants, in the amount of fifty million dollars.

## THIRD CAUSE OF ACTION

211.   Plaintiff repeats and reallege each and every allegation as more fully set forth hereinbefore as if fully set forth hereinafter.

212.   The defendants acting in concert and in conspiracy in violation of 18 U.S.C. 1962, have directly caused damage, injury, and loss to Plaintiffs and his business and are liable for treble damages.

## FOURTH CAUSE OF ACTION

213.   Plaintiff repeats and reallege each and every allegation as more fully set forth hereinbefore as if fully set forth hereinafter.

214.    The defendants, acting in concert and in conspiracy in violation of 42 U.S.C. 1983, have directly caused damage, injury, and loss to Plaintiff in the amount of fifty million dollars.

## FIFTH CAUSE OF ACTION

215.    Plaintiff repeats and reallege each and every allegation as more fully set forth hereinbefore as if fully set forth hereinafter.

216.    The defendants acting in concert and in conspiracy in violation of 42 U.S.C. 1985, have directly caused damage, injury, and loss to Plaintiff in the amount of fifty million dollars.

## SIXTH CAUSE OF ACTION

217.    Plaintiff repeats and reallege each and every allegation as more fully set forth hereinbefore as if fully set forth hereinafter.

218.    The Defendants Yanky Rubin, and Sara Rubin, acting in concert and in conspiracy have been unjustly enriched with property, money and other valuables belonging to Plaintiff, in amount currently unknown to plaintiff.

## SEVENTH CAUSE OF ACTION

219.    Plaintiff repeats and reallege each and every allegation as more fully set forth hereinbefore as if fully set forth hereinafter.

220.    The Defendants Yanky Rubin, and Sara Rubin, acting in concert and in conspiracy have been unjustly enriched by having embezzled, misappropriated, illegally converted, and defrauded the Estate of the late Alexander Yom Tov Lipa Rubin.

## EIGHTH CAUSE OF ACTION

221.    Plaintiff repeats and reallege each and every allegation as more fully set forth hereinbefore as if fully set forth hereinafter.

222.    The defendant acting in concert and conspiracy have damaged the good reputation of Plaintiff.

## NINTH CAUSE OF ACTION

223.    Plaintiff repeats and reallege each and every allegation as more fully set forth hereinbefore as if fully set forth hereinafter.

224.    The professional defendants herein acting in concert and conspiracy with the non-professional defendants herein have damaged the Plaintiff as a result of their committing malpractice of their profession, in an amount not less than one hundred and fifty million dollars.

## TENTH CAUSE OF ACTION

225.    Plaintiff repeats and reallege each and every allegation as more fully set forth hereinbefore as if fully set forth hereinafter.

226.    The Hospital defendants herein, acting in concert and conspiracy with both the professional and the non-professional defendants herein have damaged the Plaintiff as a result of their malpractice and fraud in an amount not less than one hundred and fifty million dollars.


## ELEVENTH CAUSE OF ACTION


227.    Plaintiff repeats and realleges each and every allegation as more fully set forth hereinbefore as if fully set forth hereinafter.


228.    Defendants herein, acting in concert and conspiracy, have caused Plaintiff to suffer a prima facia tort, and to be damaged as a result in an amount no less than one hundred and fifty million dollars.


## TWELFTH CAUSE OF ACTION


229.    Plaintiff repeats and realleges each and every allegation as more fully set forth hereinbefore as if fully set forth hereinafter.


230.    Defendants, acting in concert and conspiracy have damaged the Plaintiff herein as a result of their violation of the HIPPA Laws.

## THIRTEENTH CAUSE OF ACTION

231.    Plaintiff repeats and reallege each and every allegation as more fully set forth hereinbefore as if fully set forth hereinafter.

232.    Defendants herein, acting in concert and conspiracy, have caused plaintiff to suffer loss of sleep, appetite and emotional trauma (of the type that is non-threatening to self or society) and as a result was damaged in the amount of ten million dollars

**W H E R E F O R E,** Plaintiffs respectfully demands judgment against the defendants, individually and collectively, as follows:  treble compensatory damages including reasonable legal fees, for their violation of 18 USC 1962; and for the amounts set forth above for each and every one of the remaining causes of action; plus $100,000.000.00 in punitive damages.

DATED: BROOKLYN, NEW YORK
         APRIL 14, 2011

_____
ISAAC RUBIN

929 43RD ST
B'KLYN, N.Y. 11219

917-651-7377

Civil Action No.

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

x-------------------------------------------------------------------x

ISAAC RUBIN

Plaintiff,

-against-

JACOB RUBIN a/k/a YANKY RUBIN, SARAH RUBIN, MOSHE RUBIN, MOSHE
GOLDBERGER, AVROHOM ANDRUSIER a/k/a ABRAHAM ANDRUSIER,
CHEVRA HATZALAH OF NEW YORK, HATZALAH VOLUNTEER AMBULANCE
CORPS., HATZALAH OF CROWN HEIGHTS, BORO PARK HATZOLAH a/k/a
HATZALAH OF BORO PARK, HATZOLAH OF FLATBUSH a/k/a FLATBUSH
HATZOLAH CORPS., GERSHON GUTTMAN a/k/a GARRY GUTTMAN,
ABRAHAM ISAAC a/k/a AVRUMI ISAAC, HATZOLAH MEMBER "JOHN" KOFF,
HATZOLAH MEMBER YAAKOV YOEL "DOE", HATZOLAH MEMBER LEVI
"DOE" HATZOLAH MEMBER YIDDEL "DOE", HATZOLAH MEMBERS "JOHN
DOE 1-20", NEW YORK PRESBYTERIAN HOSPITAL, THE NEW YORK
HOSPITAL, CORNEL MEDICAL CENTER a/k/a CORNEL HOSPITAL, NEW YORK
COMMUNITY HOSPITAL, LONG ISLAND COLLEGE HOSPITAL, ESTATE OF
ALEXANDER YOM TOV LIPA RUBIN, CONG. BETH DAVID GERSHON AND
TALMUD TORAH, INC., JASON HERSHBERGER, CHARLES LUTHER, ALISON
LEE, SHARON HIRD, ANNA ROSEN, RICHARD STORCH, DANIEL ROSEN,
MAYA HOWELL, NEW YORK STATE COMMISSIONER OF HEALTH – DR.
NIRAV R. SHAH, NEW YORK CITY POLICE DEPARTMENT, NEW YORK CITY
POLICE OFFICER "JOE" FREIDMAN, NEW YORK STATE DEPARTMENT OF
HEALTH, J.P. MORGAN CHASE BANK, CITIBANK,

Defendants,

x-------------------------------------------------------------------x

* * * * * * * *

# COMPLAINT

* * * * * * * *

ISAAC RUBIN
929 – 43rd Street
Brooklyn, New York 11219
(917) 651- 7377